[No. 11137. Department One. January 2, 1914.]

NELSON CHILBERG et al., *Respondents*, v. GEORGE W. AIKEN et al., *Appellants*, WILLIAM F. BOYD, *Defendant.*[1]

CANCELLATION OF INSTRUMENTS—DEEDS—FRAUD—EVIDENCE—SUFFICIENCY. In an action to cancel a quitclaim deed, findings that the deed was procured by fraud of the grantee are sustained, where it appears that, in platting an addition, the grantor had unknowingly omitted a strip of land on the north side of his tract eighteen feet wide at one end and thirty-nine feet wide at the other, containing over an acre, through a mistake as to the true location of his line; and that, in consideration of $20, he made the quitclaim of the strip to the adjoining owner on the north, in reliance on the representations of the grantee's agent that the strip was but three feet wide at one end and ran to a point at the other, and that the deed was wanted to settle a dispute with a third person with whom the grantee was then on the verge of litigation, which representations were all false, the grantee knowing the size of the strip and that the

[1]Reported in 137 Pac. 487.

grantor was ignorant thereof and desiring to promote instead of settle the litigation; the representation that it was to settle the litigation being one of the moving considerations for the deed.

Appeal from a judgment of the superior court for King county, Smith, J., entered December 11, 1912, upon findings in favor of the plaintiffs, in an action to quiet title. Affirmed.

*Peters & Powell,* for appellants.

*T. F. Bevington,* for respondents.

ELLIS, J.—This action was brought in July, 1910, by the plaintiffs Chilberg, to procure the cancellation of a quitclaim deed executed by them to the defendant George W. Aiken, alleging fraud in its procurement, and to quiet title against the defendant Boyd to the lands described in the deed. This case grows out of the same general transaction involved in the case of *Aiken v. Boyd,* 55 Wash. 696, 104 Pac. 1101, the transcript of the evidence in which case was, by stipulation, made evidence in this. A brief review of that case will facilitate the statement of the issues in this.

That case arose from a dispute between Aiken and Boyd as to the true location of the south boundary line of a five-acre tract of land which Aiken had purchased from Boyd. That boundary admittedly coincided with the east and west center line of section 15, township 24, north, range 3 E. W. M., the dispute being as to the true location of that center line. Lying to the south of this five-acre tract, was a tract of land which had been platted as Chilberg's addition, by Nelson Chilberg and wife, the plaintiffs in the present action. Along the north side, and as a part of this addition, was platted a street known as Smith street, or West Andover street. The dividing line between Chilberg's land and Boyd's was the above mentioned east and west center line of section fifteen. Owing to a mistake in the survey upon which it was based, Chilberg's addition, as platted, did not extend to this line, but left a strip or gore between the north boundary of Chilberg's addition (the north marginal line of West And-

over street) and the east and west center line of section fif-
teen. This strip or gore belonged to Chilberg, but was not
included in his plat. The defendant Boyd claimed, in the
former action, and also by his cross-complaint in this ac-
tion, that this strip or gore belonged to him; claiming, among
other things, that, as between him and Chilberg, the east
and west center line of the section is the north marginal line
of West Andover street, and coincides with the north margin-
al line of Chilberg's addition, because it had been so deter-
mined by a survey of one Anderson upon which both had
subsequently relied and acted.

In *Aiken v. Boyd, supra,* we held that the south boundary
line of the tract which Aiken bought of Boyd was the east
and west center line of the section, as established by the sur-
vey of one Gardner. The strip left between that line and
Chilberg's addition is approximately thirty-nine feet at one
end and eighteen feet at the other. That decision, in effect,
fixed Aiken's north line an equal distance further north than
Boyd claimed it was. Aiken, acting upon the Gardner sur-
vey, had insisted that the north fence of his five-acre tract
should remain that distance north of where Boyd claimed the
fence should be, Aiken asserting that his five acres extend
only to the center section line as fixed by the Gardner sur-
vey; Boyd, that it extended to the line as fixed by the Ander-
son survey. It was to enjoin Boyd from interfering with this
fence that Aiken brought the former action.

Before the commencement of that action, and while Aiken
and Boyd were in dispute as to the true south boundary line,
and, in consequence, also as to the true north boundary line
of Aiken's five-acre tract, each of them approached Chil-
berg, endeavoring to procure from him a quitclaim deed of
whatever land lay between Chilberg's addition and the east
and west center line of the section. If Boyd's contention
were correct, there would, of course, be no such strip. If
Aiken's contention were correct, there would be a strip vary-
ing from over eighteen feet at one end to over thirty-nine

feet at the other. The evidence, in both cases, we think convincing that both Boyd and Aiken knew that, if there was in fact any strip owned by Chilberg, these were its dimensions and that they knew that Chilberg did not know that fact. That both Boyd and Aiken knew the extent of the mooted discrepancy was conclusively shown by the fact that Aiken claimed his north fence must remain that distance further north than it otherwise should have been, and that they were on the verge of a lawsuit about it.

Chilberg, up to this time, had no idea that he owned any land lying north of Chilberg's addition. Boyd first approached Chilberg, stating that he wanted the quitclaim deed merely to settle a dispute between him and Aiken, and that it made no difference to which he gave the deed. Chilberg testified positively that Boyd told him the strip in dispute was only about three feet wide. Afterwards, Aiken, through his father-in-law, one Warmouth, approached Chilberg for a deed, also stating, as Chilberg testified, that it was desired merely to settle a dispute between Boyd and Aiken; and Chilberg further testified, that he had sketched, on a piece of paper, which he showed to Chilberg, a diagram of this strip, and said that at one end it was three feet wide, and ran almost to a point at the other; that Chilberg then told Warmouth that, if it was only three feet, it did not amount to much and that he would give the deed, but would not do so if it would make any trouble between Aiken and Boyd. Being assured that it was to settle the dispute, Chilberg, for $20, gave Aiken the deed prepared by Aiken, describing the strip as follows:

"Commencing at Geo. W. Aiken's S. E. corner and N. E. corner of N. W. ¼ of S. E. ¼ of section 15, township 24 N. R. 3 East, thence south 3 feet more or less to Smith street as platted and of record of Chilberg's addition to West Seattle (now known as West Andover Street of the City of Seattle) thence west to the meander line of Puget Sound, thence northwesterly with the meander line of Puget Sound to a point due west of the place of beginning, thence east to the

place of beginning. All land lying between Geo. W. Aiken, south line and north line of Smith street or West Andover St."

Thereafter, Aiken, refusing to treat this deed as a settlement of his difference with Boyd, litigated with Boyd the question as to the true division line between Boyd's and Chilberg's land, as determinative of the correct location of Aiken's north line, with the result above noted. Aiken thus secured for $20 a strip of land over eighteen feet wide at one end and nearly forty feet at the other, containing about one acre, and estimated by the witnesses at from $2,000 to $5,000 in value. Boyd admitted that he told Chilberg that the quitclaim deed was desired to settle the dispute, but claimed that he told Chilberg that the disputed strip was 33 feet wide. Warmouth claimed that he went to Chilberg in response to a request from him by telephone, but admitted, in effect, that Chilberg told him Boyd had been bothering him for a deed, and that he, Chilberg, wanted to know the facts, and that Warmouth then told him that one White, who, it seems, at one time made some sort of a survey, said that there was a fraction there, he thought, about nine feet wide on the hill, and three feet at the bay. Warmouth also claimed that he knew nothing definite about the larger tract shown by the Gardner survey upon which Aiken was relying, though he admitted that he knew of the Gardner survey and that, before closing the transaction, he went back to Aiken, told him what arrangements he had made with Chilberg, and that Aiken then, in his own handwriting, prepared the deed, describing the land as three feet wide "more or less." It is clear that Aiken knew, when he prepared this deed, that Chilberg was acting under a decided misapprehension. It is worthy of notice that Aiken so drew the description, with a final blanket clause that would convey the larger tract and yet not undeceive Chilberg. Aiken reluctantly admitted that, at that time, he knew just where the Gardner survey placed the true line and that, if there was any strip owned by Chilberg, it was over eighteen feet wide at one end and over

thirty-nine feet at the other. Chilberg testified that, had he known the extent of the discrepancy, or that the deed was not intended to settle the dispute between Boyd and Aiken, he never would have signed the deed.

Chilberg was a witness in the other suit, and it may fairly be inferred that, during the progress of that suit, he dis‹ covered the extent of the strip or gore which he had quit-claimed to Aiken for the small consideration of $20, and that he, about that time, taxed both Boyd and Warmouth with having deceived him. It is admitted that, before bringing the present suit, Chilberg tendered to Aiken the $20 and the amount of taxes paid by Aiken on the land, and demanded a reconveyance, which was refused. The trial court found that Aiken procured the deed by fraud, in that it was falsely represented, on his behalf and with his knowledge and for his benefit, that the land in controversy was only a strip three feet wide, and that the deed was desired merely for the purpose of settling a dispute between Boyd and Aiken. Decree was entered accordingly. The defendants Aiken have appealed.

This seems to us one of those cases in which the facts speak the law. A careful reading of the record leads us to a clear conviction that the findings of the trial court are supported by a decided preponderance of the evidence. It is true, as appellants contend, that Aiken was buying and Chilberg was selling a contingent claim, but it is just as true that Aiken knew the magnitude of that contingency and knew that Chilberg did not know it. The evidence makes it too plain for cavil that Chilberg never intended to sell even a contingent claim to an acre of ground, and that Aiken knew that he had no such intention. When Warmouth reported to Aiken the result of his first interview with Chilberg, Aiken knew that Warmouth, his father-in-law and agent, had either wittingly or unwittingly deceived Chilberg as to the true extent of the disputed strip. We know of no rule of law or principle of equity which would countenance misrepresenta-

tion or deceit as to the extent of the subject-matter where the title to that subject-matter is contingent any more than where the title is certain. In either event, if the deception is intended to and does result in the giving of an unconscionable advantage and in the making of a conveyance which otherwise would not be made, the culpability is the same. Aiken, knowing the extent of the discrepancy between the two surveys, and believing that Chilberg had title to an acre of ground, and knowing that Chilberg was not aware of that fact, took an unfair advantage of his ignorance of the true situation, and secured a conveyance which he could not have secured by speaking the truth. To permit him to retain the fruits of his duplicity would be a reproach to our jurisprudence.

We find no merit in the appellants' claim of an estoppel by laches in that the respondents did not assert their claim until the appellants had established the title by litigation. It is undisputed that the litigation was in progress before the respondents learned of the fraud. Moreover, the court found, on what we deem sufficient evidence, that the appellant Aiken, through his agent Warmouth, represented that the quitclaim deed was desired for the very purpose of settling the dispute and preventing litigation. It seems clear that, if the respondents had known that it would not be used for that purpose, but to promote litigation, they would never have given the deed. That representation was thus one of the moving considerations for the deed. The consideration to that extent has failed. The intended litigation on Aiken's part was, therefore, but an element in, and its prosecution a furtherance of, his original fraud. Under the circumstances, Aiken himself should not be heard to assert that litigation is a reason for condoning his fraud.

No authority has been cited in either brief, and we deem none necessary to this opinion. The questions of fact having been correctly solved by the court, the rights of the

parties here are soluble on principles of elementary good faith.

The judgment is affirmed.

CROW, C. J., MAIN, GOSE, and CHADWICK, JJ., concur.